Dr. J. Jerry **RODOS** et al.

v.

Julius C. **MICHAELSON**, in his official capacity as Attorney General of the State of Rhode Island.

Civ. A. No. 750167.

United States District Court, D. Rhode Island.

June 10, 1975.

Milton Stanzler and Richard A. Boren of Abedon, Stanzler, Biener, Skolnik & Lipsey, Bruce M. Selya, Providence, R. I., for plaintiffs.

Julius C. Michaelson, Atty. Gen., for Rhode Island, Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

Plaintiffs, nineteen doctors and two women seeking abortions, bring this action for declaratory and injunctive relief against the Attorney General of the State of Rhode Island to challenge § 11–23–5 of the Rhode Island General Laws, which was enacted on or about May 21, 1975 to take effect upon passage. Section 11–23–5 provides:

"11–23–5. Willful killing of unborn child. The willful killing of an unborn quick child by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, or, the administration to any woman pregnant with a quick child of any medication, drug, or substance whatever, or, the use of any instrument or device or other means, with intent thereby to destroy such child, unless the same be necessary to preserve the life of such mother, shall in the event the death of such child be thereby produced, be deemed manslaughter.

In any prosecution under this section, it shall not be necessary for the prosecution to prove that no such necessity existed.

'Quick Child'—For the purposes of this section 'quick child' shall mean an

unborn child whose heart is beating, who is experiencing electronically-measurable brain waves, who is discernibly moving, and who is so far developed and matured as to be capable of surviving the trauma of birth with the aid of usual medical care and facilities available in this state."

Plaintiffs Jane Doe and Rebecca Roe (both pseudonyms) also seek certification as class representatives for all women similarly situated.

 The matter is presently before the Court on plaintiffs' motion for a temporary restraining order and to convene a three-judge court. A hearing was held on June 2, 1975 and continued on June 6. At the hearing Dr. Andrew Blazar, one of the named plaintiffs, testified and was cross-examined by the defendant. Dr. Blazar testified that, as a specialist in obstetrics and gynecology, he is on the staff of the Women's and Infants' Hospital, commonly referred to by its former name, "Women's Lying-In," and in that capacity he has examined plaintiffs Jane Doe and Rebecca Roe and is familiar with their medical histories. Each seek to have their pregnancy terminated at Women's Lying-In. According to Dr. Blazar, Jane Doe as of June 2 was approximately 19 weeks pregnant and Rebecca Roe as of June 6 was approximately 17 weeks pregnant. Dr. Blazar acknowledged that even the best medical judgment on this question is subject to a margin of error of approximately one week in either direction. Plaintiff Doe was originally scheduled to have her pregnancy terminated by "hypertonic saline infusion" approximately ten days earlier.[1] This procedure has been performed at Women's Lying-In to terminate pregnancies of approximately 16 to 19 weeks. The hospital does not perform abortions beyond 20 weeks. Shortly after § 11–23–5 was enacted, the hospital staff collective-

ly and Dr. Blazar individually determined to suspend all abortions by saline infusion, for the first time in twenty months, because they fear prosecution under this new law. No saline procedures have been performed at the hospital since that time.

### Justiciability

 In making his argument that injunctive relief is inappropriate, the defendant suggests that plaintiffs' fear of prosecution is unreasonable and speculative at best.

"Although the exact time in the chronology of the pregnancy when the fetus becomes 'viable' may vary, the medical evidence reveals that viability, at its earliest, occurs substantially beyond the seventeenth week. L. Hellman & J. Pritchard, Williams Obstetrics, 493 (14th ed., 1971), cited with approval, *Roe v. Wade*, 410 U.S. [113] at 160, fn. 60, [93 S.Ct. 705, 35 L.Ed. 2d 147]. Thus, there can be no fear on the part of the physicians that [prosecution] will necessarily follow the abortion of a seventeen week old fetus since that fetus would, according to the medical literature, be incapable of surviving the trauma of birth with the aid of usual medical care and facilities available in the state."

Defendant's Supplemental Memorandum at 2.

Defendant has thus raised the question whether there is a "live and acute" controversy between the parties. The statute in question, unlike the one before the Supreme Court in *Poe v. Ullman*, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961), "is recent and not moribund." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973). In addition, there is no question that plaintiffs Doe, Roe, and all other women approximately 16 to 19 weeks' pregnant are presently unable to secure an abor-

---

1. On June 6, 1975, plaintiff Doe's pregnancy was terminated at a medical facility in New York state. This, of course, does not moot her claim. *Doe v. Israel*, 358 F.Supp. 1193 (D.R.I.1973), *stay denied*, 482 F.2d 156, 158 (1st Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772.

tion at Women's Lying-In [2] as a result of the doctors' position on § 11–23–5. There can be little doubt that each woman's decision to obtain an abortion is being thwarted by the new Rhode Island enactment, however reasonable or unreasonable the doctors' fear of prosecution thereunder might be. Thus, as to plaintiffs Doe and Roe, the " 'logical nexus between the status asserted and the claim sought to be adjudicated,' *Flast v. Cohen,* 392 U.S. [83], at 102, [88 S. Ct. 1942, 20 L.Ed.2d 947] and the necessary degree of contentiousness, *Golden v. Zwickler,* 394 U.S. 103, [89 S.Ct. 956, 22 L.Ed.2d 113] (1969), are both present" and their standing to challenge § 11–23–5 is thereby demonstrated.[3] *Roe v. Wade,* 410 U.S. 113, 124, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973); *Doe v. Israel,* 358 F.Supp. 1193, 1197–1198 (D.R. I.1973), *stay denied,* 482 F.2d 156 (1st Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2406, 40 L.Ed.2d 772. *See Truax v. Raich,* 239 U.S. 33, 39, 36 S.Ct. 7, 60 L.Ed. 131 (1915); *Women's Liberation Union of Rhode Island, Inc. v. Israel,* 379 F.Supp. 44, 46 (D.R.I.1974), *aff'd,* 512 F.2d 106 (1st Cir. 1975).

Furthermore, plaintiff doctors' fear of prosecution can hardly be termed unreasonable or merely speculative in this case although no doctor has yet been prosecuted or threatened with prosecution under this statute. It is difficult to detect any difference between the position of these plaintiffs and the plaintiff-physicians in *Doe v. Bolton, supra,* wherein the Supreme Court stated at 410 U.S. 188, 93 S.Ct. at 745:

"[T]he physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing despite the fact that the record does not disclose that any one of them has. been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes. The physician is the one against whom these criminal statutes directly operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."

As alleged in the Complaint, plaintiff physicians are all on the staff of Women's and Infants' Hospital and specialize in obstetrics and gynecology. They assert that § 11–23–5 applies to prohibit certain abortions performed by them at Women's Lying-In prior to the third trimester of a woman's pregnancy.

While the Complaint suffers somewhat from the conclusory nature of its allegations, Dr. Blazar's testimony revealed the basis of the asserted fear of prosecution. Although he was not aware of a case where a nineteen-week old fetus had survived, the gestational age of a fetus cannot conclusively be determined prior to termination and is always subject to a margin of error. In addition, he stated that he was unable to determine at what point in pregnancy § 11–23–5 would apply, based on the definition of "Quick Child" within the statute.[4] Furthermore, the hypertonic saline infusion technique eliminates the ability to provide life-support services to

2. According to Dr. Blazar, who is also associated with Rhode Island Hospital, Miriam Hospital, and Roger Williams General Hospital, which are all Rhode Island hospitals, Women's Lying-In is the only hospital regularly performing abortions in the state. Furthermore, the availability of other relief does not moot the case. *Doe v. Israel, supra,* 482 F.2d at 158.

3. In view of my decision that the statute is unconstitutional on its face, I do not consid-

er the class action allegations of the Complaint.

4. The use of the term "quick child" in § 11–23–5 may be misleading and may not be synonymous with its application at common law, which placed "quickening" at approximately the sixteenth to eighteenth week of pregnancy. *Roe v. Wade, supra,* 410 U.S. at 132, 93 S.Ct. 705.

the fetus after it is removed from the womb so as to offset an underestimate in gestational age. Thus, were he to terminate a woman's pregnancy by saline infusion, Dr. Blazar could not with certainty eliminate the possibility that fetal development had been underestimated and that the fetus fell within the definition of "Quick Child" under the statute. But by the earliest point for making such a determination, the fetus would have been destroyed and medical aid, whether "usual" or "extraordinary," would be unavailing. At the same time, Dr. Blazar stated that, in his medical judgment, no other medical procedure which can be used to terminate a 16 to 24-week pregnancy, such as a hysterotomy, even approximates the safety to the pregnant woman of saline infusion, and he therefore would not prescribe an alternate procedure. He could only recommend that Jane Doe seek an abortion out of the State. *See* note 1 *supra.*

Although defendant suggested in his brief, quoted *supra* at page 771, that any fear of prosecution for termination of a seventeen-week pregnancy would be unreasonable,[5] upon questioning of the Court the defendant specifically declined to state that the termination of an estimated nineteen-week pregnancy could never fall within the purview of § 11–23–5 and cited the same possibility of error that caused Dr. Blazar to fear prosecution under the statute and to refuse to perform any abortions after the fifteenth week. Certainly the doctor is not required to expose himself to prosecution for manslaughter in the event that he underestimates gestational age before the Court can recognize the existence of a justiciable controversy. *Doe v. Bolton, supra,* 410 U.S. at 188, 93 S.Ct. 739.

*Three-Judge Court*

In seeking to enjoin the enforcement of § 11–23–5 as facially unconstitutional, plaintiffs ask that a three-judge court be convened pursuant to 28 U.S.C. § 2281. Although at first blush the applicability of 28 U.S.C. § 2281 to the instant action seemed manifest, the Court is mindful of the Supreme Court's clear direction to the federal district court, expressed in numerous decisions, to avoid unnecessary referrals to three-judge courts. *See Hagans v. Lavine,* 415 U.S. 528, 543–545, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Rosado v. Wyman,* 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L. Ed.2d 442 (1970); *Swift & Co. v. Wickham,* 382 U.S. 111, 128, 129, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); *Bailey v. Patterson,* 369 U.S. 31, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). *Cf. Lund v. Affleck,* 388 F.Supp. 137, 139 n. 1 (D.R.I. 1975).

A three-judge court need not be convened to determine, *inter alia,* an action to enjoin a state statute where "there is no substantiality to the claim that a state statute on its face is not unconstitutional. *Bailey v. Patterson,* 1962, 369 U.S. 31, 33, 82 S.Ct. 549, 7 L. Ed.2d 512; *see* United Low Income, Inc. v. Fisher, 1 Cir., 1972, 470 F.2d 1074." *Doe v. Israel, supra,* 482 F.2d at 158. *See also Doe v. Israel, supra,* 358 F. Supp. at 1198–1199. In keeping with the Supreme Court's mandate, the Court must first determine whether § 11–23–5, due to its failure to except from its prohibition those post-"quickening" abortions which are necessary to preserve the "health" of the pregnant woman, is so patently unconstitutional as to obviate the need to convene a three-judge court. The nature of the inquiry to be made was reviewed by the Supreme Court in *Goosby v. Osser,* 409 U.S. 512,

---

5. Indeed, it cannot be assumed that such an assurance *would* alter our determination that the plaintiffs have presented a "live and acute" controversy. *See Montalvo v. Colon,* 377 F.Supp. 1332, 1334 (D.P.R.1974) (three-judge court). *See also Doe v. Bolton, supra,* 410 U.S. at 208, 93 S.Ct. 739 (Burger, C. J., concurring in *Roe v. Wade, supra,* and *Doe v. Bolton*). *Cf. Goosby v. Osser,* 409 U.S. 512, 516–517, 93 S.Ct. 854, 35 L.Ed.2d 36.

518, 93 S.Ct. 854, 858, 35 L.Ed.2d 36 (1973):

"Title 28 U.S.C. § 2281 does not require the convening of a three-judge court when the constitutional attack upon [or defense of] the state statutes is insubstantial. 'Constitutional insubstantiality' for this purpose has been equated with such concepts as 'essentially fictitious,' *Bailey v. Patterson*, 369 U.S., at 33 [82 S.Ct. 549]; 'wholly insubstantial,' *ibid.;* 'obviously frivolous,' *Hannis Distilling Co. v. Baltimore*, 216 U.S. 285, 288 [30 S.Ct. 326, 54 L.Ed. 482] (1910); and 'obviously without merit,' *Ex parte Poresky*, 290 U.S. 30, 32 [54 S.Ct. 3, 78 L.Ed. 152] (1933). The limiting words 'wholly' and 'obviously' have cogent legal significance. In the context of the effect of prior decisions upon the substantiality of constitutional claims, those words import that claims are constitutionally insubstantial only if the prior decisions inescapably render the claims frivolous; previous decisions that merely render claims of doubtful or questionable merit do not render them insubstantial for the purposes of 28 U.S.C. § 2281. A claim is insubstantial only if ' "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject and leave no room for the inference that the questions sought to be raised can be the subject of controversy." ' *Ex parte Poresky, supra,* at 32, [54 S.Ct. 3] quoting from *Hannis Distilling Co. v. Baltimore, supra,* at 288 [30 S.Ct. 326]; see also *Levering & Garrigues Co. v. Morrin,* 289 U.S. 103, 105–106 [53 S.Ct. 549, 77 L.Ed. 1062]. (1933); *McGilvra v. Ross,* 215 U.S. 70, 80 [30 S.Ct. 27, 54 L.Ed. 95] (1909)."

*See also Hagans v. Lavine, supra,* 415 U.S. at 537–538, 94 S.Ct. 1372.

We begin our inquiry, then, with the Supreme Court decisions in *Roe v. Wade, supra,* and *Loe v. Bolton, supra.* After exhaustive analysis of the medical and legal history of abortion and a delicate balancing of the competing interests involved, the Supreme Court in *Roe v. Wade* identified three successive stages of pregnancy which determined the scope of the State's ability to regulate abortions:

"1. A state criminal abortion statute of the current Texas type, that excepts from criminality only a *life-saving* procedure on behalf of the mother, without regard to pregnancy stage and without recognition of the other interests involved, is violative of the Due Process Clause of the Fourteenth Amendment.

(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother."

*Id.* 410 U.S. at 164–165, 93 S.Ct. at 732 (emphasis in original).

▬ Whether or not it has succeeded, it is clear that the Rhode Island General Assembly intended § 11–23–5 to fit within stage "1(c)" of *Roe v. Wade,* quoted above. *Compare Doe v. Rampton,* 366 F.Supp. 189, 200 (D.Utah 1973) (three-judge court, Anderson, J., dissenting), on *remand* from 410 U.S. 950, 93 S.Ct. 1423, 35 L.Ed.2d 683 (1973). It is equally clear, however, that § 11–23–5 fails to incorporate in full the languge of *Roe v. Wade* by ex-

cepting "from criminality only a *life-saving* procedure on behalf of the mother," 410 U.S. at 164, 93 S.Ct. at 732 (emphasis in original), and not excepting as well a *health-preserving* procedure. *Id.* at 164, 165, 93 S.Ct. 705. The two terms are clearly not synonymous. In *Doe v. Bolton, supra,* 410 U.S. at 191–192, 93 S.Ct. 762, the Court reaffirmed its holding in *United States v. Vuitch,* 402 U.S. 62, 71–72, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971), that the term "health" was not unconstitutionally vague and that it was to be construed broadly in accordance "with the general usage and modern understanding of the word 'health,' which includes psychological as well as physical well-being." *United States v. Vuitch, supra,* at 72, 91 S.Ct. at 1299.

> "Whether, in the words of the Georgia statute, 'an abortion is necessary' is a professional judgment that the Georgia physician will be called upon to make routinely.
>
> We agree with the District Court, 319 F.Supp., at 1058, that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman."

*Doe v. Bolton, supra,* 410 U.S. at 192, 93 S.Ct. at 747. *See also* Burger, J., concurring in *Roe v. Wade, supra,* and *Doe v. Bolton, supra,* 410 U.S. at 207–208, 93 S.Ct. 762.

In sharp contrast to this broad construction, the Court observed in *Roe v. Wade,*

supra, 410 U.S. at 164, 93 S.Ct. 705 that the Texas statute "limits to a single reason, 'saving' the mother's life, the legal justification" for an abortion. The same observation must be made as to R. I.G.L. § 11–23–5. It was clearly the legislature's intent to limit, to the fullest extent possible, the performance of abortions after "quickening" as defined in the statute. This Court is not in a position to rewrite the statute. That, of course, is a legislative function. Severance is not available to save the statute as was arguably the case in *Doe v. Rampton, supra,* at 199 (separate opinion of Lewis, J.) and 200–202 (Anderson, J., concurring in part and dissenting in part). *See Doe v. Turner,* 361 F.Supp. 1288, 1292 (S.D.Iowa 1973) (three-judge court). Moreover, this Court cannot predict how the legislature would choose to rewrite the statute, if at all, to accommodate this interest in preserving the woman's health.[6] *See Dorchy v. Kansas,* 264 U.S. 286, 289–290, 44 S.Ct. 323, 68 L.Ed. 686 (1924).

Defendant has argued that this Court should abstain from considering the constitutionality of § 11–23–5 in recognition that the Rhode Island courts may give its terms a constitutionally acceptable construction. In support of his position he cites *Henrie v. Derryberry,* 358 F.Supp. 719 (N.D.Okl.1973) (three-judge court). As he acknowledges, however, in *Montalvo v. Colon,* 377 F.Supp. 1332 (D.P.R.1974), a three-judge court for the District of Puerto Rico, in concluding that abstention was inappropriate in an attack on a similar statute, expressly disagreed with the decision in *Henrie v. Derryberry, supra,* stating, 377 F.Supp. at 1344 n. 26:

> "We disagree with the implication in *Henrie v. Derryberry, supra,* at 726,

---

6. For example, the Rhode Island General Assembly might choose to insert an exemption such as "except to prevent *serious and permanent* damage to the woman's health," which two of the judges in *Doe v. Rampton, supra,* believed would comport with *Roe v. Wade, supra,* and *Doe v. Bolton, but compare Doe v.*

*Bolton, supra,* 410 U.S. at 183 and 220–221, 93 S.Ct. 762 (Douglas, J., concurring in *Doe* and *Roe v. Wade, supra*) or it might decide that an exception which precisely tracks the language of *Roe v. Wade, supra,* 410 U.S. at 164, 165, 93 S.Ct. 705, would be appropriate and less open to challenge in the courts.

that the phrase preservation of the 'life of the mother' can be construed to include consideration of her health. Plain language cannot be stretched so far." [7]

In view of the Supreme Court's broad characterization of "health" in *Doe v. Bolton, supra,* and *United States v. Vuitch, supra,* as contrasted with the restrictive reading it gave to "life" in *Roe v. Wade, supra,* 410 U.S. at 164, 93 S.Ct. 705, this Court is persuaded by the logic of the *Montalvo* court's observation that the "life-saving" exception of § 11–23–5 cannot be construed to include "health" and, further, that such a construction would not in any event meet the constitutional minimum required by *Roe* and *Doe.*[8] The reasons for reaching this conclusion were examined in *Doe v. Turner, supra,* at 1291–1292:

"This interpretation of 'life' to include 'health' still sweeps too broadly under the Supreme Court guidelines in that it draws the link between health and life by saying endangered health must endanger life. Roe v. Wade holds that a state can proscribe abortions in the third trimester, 'except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' No showing needs to be made that the preservation of the health of the mother is related to preservation of her life. Therefore, even if Iowa's interpretation of 'life' in the old divorce law was extended to the interpretation of 'life' in the abortion statute, it would be more restrictive than the Roe v. Wade guidelines

and the abortion statute would be invalid."

In addition, the Court can only echo the view of the court in *Montalvo v. Colon, supra,* at 1335, that abstention is particularly inappropriate in a case which raises extremely important and temporal rights "which [are] effectively lost through even minor delay." The delay inevitably produced by abstention, *see England v. Medical Examiners Louisiana State Board of Medical Examiners,* 375 U.S. 411, 418, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964), would only foster further uncertainty among medical practitioners and would undoubtedly cause some physicians to continue to refuse to perform abortions which, in their best medical judgment, would otherwise be warranted.

"[W]here the consequences of state intervention are so severe, uncertainty must be avoided as much as possible."

*Doe v. Bolton, supra,* 410 U.S. at 208, 93 S.Ct. at 756 (Burger, C. J., concurring in *Doe* and *Roe v. Wade, supra.*) *See Doe v. Woodahl,* 360 F.Supp. 20, 22 (D.Mont.1973). *See also Zwickler v. Koota,* 389 U.S. 241, 252, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Hathaway v. Worcester City Hospital,* 475 F.2d 701, 705 (1st Cir. 1973). *Cf. Dempsey v. McQueeney,* 387 F.Supp. 333, 339–341 (D.R.I.1975).

The Court therefore concludes that § 11–23–5, in its failure to except the preservation of the pregnant woman's health from its terms, is facially unconstitutional and defendant's claim that it is not unconstitutional is "wholly insubstantial." *Roe v. Wade, supra; Doe*

---

7. With all due deference, the court in *Henrie v. Derryberry* appears to have based its determination that a state court could construe "life" to include "health" in part on a mistaken belief that the Supreme Court had already done so in *Roe v. Wade, supra. See Henrie v. Derryberry, supra,* at 726. To the contrary, the Texas statute at issue in *Roe v. Wade,* was invalidated precisely for the reason that, in recognizing "only a *life-saving* procedure on behalf of the mother," 410 U.S. at 164, 93 S.Ct. at 732, it failed to con-

sider other interests involved, including "health."

8. Although it is not clear whether the question of abstention was before the Supreme Court in *Doe v. Bolton, supra,* the Court did rule on the constitutionality of the Georgia statutes despite its observation that the Georgia state courts had not yet had an opportunity to consider them. *Id.,* 410 U.S. at 183, 93 S.Ct. 762.

v. Bolton, supra; Montalvo v. Colon, supra; Doe v. Rampton, supra; Doe v. Turner, supra. Cf. United States v. Vuitch, supra. But see Henrie v. Derryberry, supra; Larkin v. Wayne Prosecutor, 389 Mich. 533, 208 N.W.2d 176 (1973).[9] As a result, the Court concludes that a three-judge court need not be convened.[10] Bailey v. Patterson, supra; Doe v. Israel, supra, 482 F.2d ·at 158.

9. The Michigan court in Larkin v. Wayne Prosecutor, supra, does not appear to have considered the fact that the Michigan statute, upon which R.I.G.L. § 11–23–5 is based, failed to recognize a "health-preserving" exception.
Defendant's reliance on Planned Parenthood of Missouri v. Danforth, 392 F.Supp. 1362, (E.D.Mo.1975) (three-judge court), stay granted, 420 U.S. 918, 95 S.Ct. 1111, 43 L.Ed.2d 389, is misplaced on this issue. The Missouri statute under attack in that case, Mo.1974 Laws, Page 239, § 2(5) (adopted 6/14/74), expressly excepted "health" as well as "life" from its proscription.

10. In view of this conclusion, the Court does not reach the more complex and thorny questions raised by the statute in its definition of "Quick Child," which plaintiffs contend is void for vagueness in failing to establish a meaningful standard to which doctors can conform their practice, see, e. g., Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and in its prohibition of "post-quickening" abortions, which plaintiffs argue is facially overbroad in failing to exclude the first and second trimesters of pregnancy from its reach. Roe v. Wade, supra, 410 U.S. at 164, 93 S.Ct. 703. See Hodgson v. Anderson, 378 F.Supp. 1008, 1016 (D.Minn.1974), remanded to 8th Cir. sub nom., Spannaus v. Hodgson, 420 U.S. 903, 95 S.Ct. 819, 42 L.Ed.2d 832 (1975); Doe v. Rampton, supra. Cf. Nyberg v. City of Virginia, 495 F.2d 1342 (8th Cir. 1974), appeal dismissed, 419 U.S. 891, 95 S.Ct. 169, 42 L.Ed. 136 (1974). Had the statute not suffered so clearly and inextricably from the fatal omission of "health" as an exception, these issues would have to have been resolved by a three-judge court. The Court has refrained from addressing these issues or requesting a three-judge court in its belief that constitutional and jurisprudential concepts counsel the courts not to reach out unnecessarily to decide issues of constitutional law. See Ashwander v. T. V. A., 297 U.S. 288, 346–348, 56 S.Ct. 466, 80 L.Ed. 688 (1936)

## Injunctive Relief

Although conceding that the Court may properly grant declaratory relief in the case at bar, Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), the defendant argues that the Court is without power to enjoin future prosecutions under § 11–23–5 by virtue of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its companion cases,[11] since

(Brandeis, J., concurring). At the same time, the Court recognizes that plaintiffs' attack on the statute was not based directly upon this patent defect, since the Complaint makes no reference to a need to perform or obtain an abortion to preserve a woman's health, but rather was based upon the issues of vagueness and overbreadth. The Complaint and supporting affidavits do allege that the statute infringes upon the plaintiff physicians' ability to exercise sound medical judgment in treating pregnant patients, which, of course, includes considerations of "health," as defined in Doe v. Bolton, supra, and to that extent the statute's rejection of "health-preserving" abortions is in issue. Nonetheless, our focus herein is open to the same criticism, as that voiced by Justice Rehnquist in his dissent in Roe v. Wade, supra, 410 U.S. at 171–172, 93 S.Ct. 705, and by Justice White in his dissent, 410 U.S. at 222–223, 93 S.Ct. 705, in both Roe and Doe. Despite this criticism, a majority of the Supreme Court did fashion a broad rule of constitutional law in this area which cannot be overlooked. In addition, in the case at bar the limited focus which the dissenting views would require would produce the anomalous result of the Court's ignoring a glaring constitutional defect in order to address complex and unsettled issues of constitutional law, a result which would collide with both the Supreme Court mandate to minimize the use of three-judge courts, see discussion supra at 773–774, and the constitutional concepts which appear to have prompted the dissents in the first place.

11. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971), and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971). See also Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

none of the exceptional circumstances cited in *Younger* are present here. *Cf. Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

In *Roe v. Wade, supra,* the Supreme Court stopped short of answering the troublesome question as to whether the bright-line distinction it drew between threatened prosecution and actual institution of criminal proceedings in *Steffel v. Thompson, supra,* as to actions brought in federal court for declaratory relief also applies to actions for injunctive relief.[12] The Court found it unnecessary to reach the issue because it assumed that there would be full compliance with the Court's decision despite the absence of an injunction. *Roe v. Wade, supra,* 410 U.S. at 166, 93 S.Ct. 705.[13] This Court similarly believes that the defendant herein will abide by its declaration that R.I.G.L. § 11–23–5 is unconstitutional and on that basis declines to grant injunctive relief.[14]

Plaintiffs shall prepare an order accordingly.

---

12. *Compare Steffel v. Thompson, supra,* and *Ellis v. Dyson,* 421 U.S. 426, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975), *with Samuels v. Mackell, supra,* and *Younger v. Harris, supra. See Dempsey v. McQueeney, supra,* at 338–339, nn. 5–7.

13. Taking their cue from the Supreme Court's decisions in *Roe* and *Doe,* a number of the lower federal courts faced with the issue have declined to grant injunctive relief in reliance upon the good faith of the prosecutor. *See, e. g., Hodgson v. Anderson, supra,* at 1019; *Doe v. Woodahl, supra,* at 22. *See also, Roe v. Wade,* 314 F.Supp. 1217, 1224 (N.D.Tex.1970) *aff'd on other grounds,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). *But see Montalvo v. Colon, supra,* at 1344; *Doe v. Rampton, supra,* at 194 (each granting injunctive as well as declaratory relief). These refusals to grant injunctive relief share a common element: at the time the decision was rendered, the court, as in the instant case, was in a position to and did grant declaratory relief. At this stage, the analogous equitable relief would appear to have been a permanent injunction. The more troubling question presents itself when a court is asked to grant injunctive relief at a time before the merits can be reached, i. e., on a request for a temporary restraining order or for preliminary injunction. At this stage, a refusal to grant injunctive relief pending determination on the merits leaves the medical practitioners in a state of uncertainty and leaves their patients who desire to terminate their pregnancies without recourse in the state. This state of limbo is particularly intensified when the issues to be determined require a three-judge court and the inevitable delay thereby engendered. Without meaning to denigrate the importance of the right of freedom of expression, in an analogous situation, words left unspoken until a decision on the merits could be proclaimed at a later time. The rights involved in an individual woman's decision to terminate a pregnancy cannot similarly be reserved and later reasserted. All of these observations argue for the granting of extraordinary relief. Yet at the same time we cannot ignore the fact that even equitable relief cannot meaningfully preserve the status quo, one of the traditional reasons for it, since the decision to allow the abortion is equally irreversible and destructive of the state interests underlying the statute. It is this tension which appears to have caused many courts, including this one, great concern when confronted with a request for interim relief. I would note, however, that interim relief was granted plaintiffs in both *Hodgson v. Anderson, supra,* at 1011, and *Doe v. Woodahl, supra,* at 22, despite the courts' later refusal to grant permanent injunctive relief. The *Younger* question raised by the defendant herein was not addressed in those decisions.

14. *See Doe v. Israel, supra,* 358 F.Supp. at 1202. The Court therefore does not reach the question whether the principles of *Younger* or those of *Steffel* apply to the issue of pre-prosecution injunctive relief.